738 So.2d 864 (1999)
Ex parte Billy SHELTON and Mae Clark.
Re Mae Clark and Billy Shelton
v.
Blue Cross and Blue Shield of Alabama.
1970816.
Supreme Court of Alabama.
June 11, 1999.
*865 Myron K. Allenstein of Allenstein & Associates, Gadsden, for petitioners.
Cavender C. Kimble and Teresa G. Minor of Balch & Bingham, L.L.P., Birmingham; and George P. Ford of Ford & Associates, P.C., Gadsden, for respondent.
Jere L. Beasley, W. Daniel "Dee" Miles III, and Joseph H. "Jay" Aughtman of Beasley, Wilson, Allen, Crow & Methvin, P.C., Montgomery, for amicus curiae Alabama *866 Trial Lawyers Ass'n, in support of the petition for writ of mandamus.
Joseph G. Stewart, Montgomery, for amicus curiae Silicone Survivors Support Network, in support of the petition for writ of mandamus.
E.J. "Mac" McArthur, Montgomery, for amicus curiae Alabama State Employees Ass'n, in support of the petition for writ of mandamus.
Darron C. Hendley, Montgomery, for amicus curiae Democrats for Christian Values, in support of the petition for writ of mandamus.
James C. King of King, Ivey & Warren, Jasper, for amicus curiae United Mine Workers of America-District 20, in support of the petition for writ of mandamus.
Joe M. Reed, Montgomery, for amicus curiae Alabama Democratic Conference, in support of the petition for writ of mandamus.
Katy Smith Campbell of Chestnut, Sanders, Sanders & Pettaway, Selma, for amicus curiae Alabama New South Coalition, Inc., in support of the petition for writ of mandamus.
Mickey DeBellis, amicus curiae, pro se, in support of the petition for writ of mandamus.
Corrie Haanschoten, Montgomery, for amicus curiae Alabama Education Ass'n, in support of the petition for writ of mandamus.
Alva C. Caine of Hare, Wynn, Newell & Newton, Birmingham, amicus curiae, in support of the petition for writ of mandamus.
Phillip W. McCallum of McCallum & Associates, Birmingham, amicus curiae "We the Jury", in support of the petition for writ of mandamus.
John A. Owens of Owens, Carver & Almond, Tuscaloosa, amicus curiae, in support of the petition for writ of mandamus.
Joe R. Whatley of Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, for amicus curiae American Federation of Labor-Congress of Industrial Organizations (AFL-CIO), in support of the petition for writ of mandamus.
Earl Goodwin, amicus curiae, pro se, in support of the petition for writ of mandamus.
Christopher Reeve, amicus curiae, pro se, in support of the petition for writ of mandamus.
Reo Kirkland, Jr., Brewton, for amicus curiae Escambia County Democratic Executive Committee, in support of the petition for writ of mandamus.
Darron C. Hendley, Montgomery, for amici curiae Dog Hunters Ass'n, Victims of Crime and Leniency, Mothers Against Drunk Driving, Alabama Retired Teachers Ass'n, Wheelin' Sportsmen of America, Inc., and Alabama Head Injury Foundation, in support of the petition for writ of mandamus.
William B. Sellers of Kaufman & Rothfeder, P.C., Montgomery, for amicus curiae Alabama Citizens for a Sound Economy, in opposition to the petition for writ of mandamus.
Prof. Gene A. Marsh, Tuscaloosa, amicus curiae, in support of the petitioner.
E. Berton Spence of Lange, Simpson, Robinson & Somerville, L.L.P., Birmingham, for amicus curiae Alabama Healthcare Council, in opposition to the petition for writ of mandamus.
Jeffrey E. Friedman and John Michael Bowling of Starnes & Atchison, Birmingham, for amicus curiae Consumer Credit Ins. Ass'n, in opposition to the petition for writ of mandamus.
Matthew C. McDonald and Christopher Kern of Miller, Hamilton, Snider & Odom, L.L.C., Mobile; and Phillip E. Stano of American Council of Life Ins., Washington, D.C., for amicus curiae American Council of Life Ins., in opposition to the petition for writ of mandamus.
Michael A. Bownes, general counsel; and Terry L. Raycraft and John J. Davis, associate counsel, Alabama Dep't of Ins., for amicus curiae Richard H. Cater, commissioner *867 of insurance, on the issue of the legality of arbitration clauses in insurance contracts.
PER CURIAM.
Mae Clark[1] petitions for a writ of mandamus directing the Etowah Circuit Court to vacate its order compelling her to arbitrate her claims against Blue Cross and Blue Shield ("BCBS"). Clark maintains that arbitration should not be compelled because (1) she says she did not agree to arbitrate any claims against BCBS and (2) she says Alabama law prevents the trial court from specifically enforcing the arbitration provision, which BCBS added to Clark's insurance policy by an amendment. We deny the petition.
On March 1, 1991, Clark submitted an application to BCBS for a Medicare-supplement policy, referred to as BCBS's "C Plus Medicare Select Contract" ("C Plus"). BCBS initiated coverage of Clark on that same date. Effective July 1, 1992, BCBS amended its C Plus contacts to include a mandatory binding-arbitration provision. In the summer of 1992, it sent a newsletter entitled "C Plus UPDATE" to all C Plus insureds; that newsletter noted the amendment to the contract and stated that an insured's continued payment of premiums constituted acceptance of the arbitration provision. Thereafter, in November 1993, BCBS sent a revised contract containing the arbitration clause, along with a cover letter, to all C Plus insureds.
In the interest of clarity we present the following chronology of this case:
February 26, 1997Clark filed her complaint against BCBS.[2]
March 28, 1997BCBS moved to dismiss the complaint or, in the alternative, to compel arbitration.
January 28, 1998The court heard oral argument; granted BCBS's motion to compel arbitration; and stayed proceedings pending arbitration.
February 4, 1998Clark filed a "motion to alter, amend, or vacate" the order compelling arbitration, or, in the alternative, to order a jury trial on the issue whether Clark had agreed to arbitration.
February 6, 1998BCBS responded to Clark's motion.
February 10, 1998Clark requested oral argument on her motion.
February 11, 1998Clark petitioned this Court for a writ of mandamus.
March 3, 1998Clark filed an amended motion to alter, amend, or vacate the order compelling arbitration; this amended motion was based, in part, on the McCarran-Ferguson Act.
March 4, 1998The court conducted a hearing on Clark's request for oral argument; received submissions from Clark; and held the case in abeyance pending this Court's response to Clark's petition for the writ of mandamus.
March 12, 1998Clark filed an amended petition for the writ of mandamus.
BCBS argues that several issues raised by Clark are not properly before this Court because they were not timely raised in the lower court; among them, BCBS challenges the issue concerning the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1012. It is clear from the record that the issue whether the McCarran-Ferguson Act (the "McCarran Act") operates to prevent federal law from preempting state law in Ms. Clark's lawsuit was not *868 before the trial judge when he granted BCBS's motion to compel arbitration on January 28, 1998. Clark raised the McCarran Act issue in the trial court on March 3, 1998, when she filed an amended motion to alter, amend, or vacate the trial judge's order. On February 11, 1998, before filing the amended motion and raising the McCarran Act issue, Clark had filed the mandamus petition that is now before this Court. On March 4, 1998, the trial judge received submissions from Clark and postponed ruling on Clark's amended motion to alter, amend, or vacate (which had raised the McCarran Act issue), until this Court ruled on Clark's pending mandamus petition. We quote here the transcript of that March 4, 1998, proceeding:
"The Court: This was a hearing set for reconsideration of a prior ruling of the Court in the case of Mae Clark versus Blue Cross and Blue Shield of Alabama. It's CV-97-210.
"In this case, I had issued an order that arbitration could be compelled in this particular case. And because of that ruling, the plaintiff was required or obligated to take a mandamus proceeding within a particular period of time, fourteen days I believe. I also set a hearing for reconsideration of that motion and that's what we're here for today.
"And I'd indicated to at least defense counsel that while if the mandamus had been ruled upon, then we could know whether or not we could hold this hearing. And I didn't indicate that to the plaintiff's attorney. But anyway we're here this morning.
"What I'm going to do is since we've not heard from the mandamus at this time, I'm going to file these additional pleadings by the plaintiff in the Court, hold them in abeyance pending the outcome. And we'll not hold the hearing today.
"And ... do you want to put something in the record about your position on the [mandamus petition]?
"[Plaintiff's attorney]: Yes, Judge.
"First of all, I wasn't sure whether it was a fourteen-day deadline or not. Presently, there is no deadline, so I felt like I really filed the petition for mandamus prematurely, but I did it out of the abundance of caution to make sure that there was not a deadline.
"It's my understanding when you file a premature appeal or even a premature petition for mandamus that it's held in abeyance pending final disposition of the issues by the local court, and any new information would be again submitted to the higher court on the mandamus.
"And we came here for two purposes today; one, asking you to reconsider your prior ruling, and I had some more argument on that issue.
"And second of all, Judge, it's my understanding that you previously ruled that as a matter of law there was an arbitration agreement. And it's my opinion that there's still some factual issues that need to be resolved and that plaintiff has filed a timely [petition] to have those issues determined by a jury. It's not set out in the law or the Rules of Civil Procedure exactly when a timely request for a jury trial has to be filed under the FAA because this is all a very new body of law that's being basically imposed by preemption from federal law. So all the procedures have not been worked out.
"But I feel like in light of your last ruling that we have made a timely request for a jury trial. We've not waived the right to a jury trial.
"And also today, Judge, I've made some additional submissions. One, I've been trying to get from the Alabama Insurance Department their position on approval of arbitration agreements. And so I finally at 5:00 o'clock yesterday received a letter from general counsel for the insurance commission. His name is Michael Bownes. And he attached some draft guidelines for approval of arbitration provisions, which have not been adopted. And he says that the *869 ones they will adopt will be quite a bit different from these. So I just submit that.
"The Court: Okay. Those are in the pending record now.
"[Plaintiff's attorney]: And also I have submitted a copy of the insurance contract which basically shows that the contract as issued said this contract is issued and delivered in the State of Alabama and will be governed by the law of Alabama. And I quote that because that might come under the umbrella of the one case that says unless otherwise prohibited by law.
"The Court: Okay. Well, I understand you're going to supplement your petition on mandamus with these submissions. We'll wait for the outcome of that.
"[Plaintiff's attorney]: So, Judge, again, you've not ruled as to whether I'm entitled to a jury trial. We're just going to kind of leave everything pending until the appellate court rules.
"The Court: We'll wait. Yeah, I think that's the proper thing to do."
Clark filed an amended mandamus petition in this Court on March 12, 1998, arguing the merits of her McCarran Act issue.
The writ of mandamus is an extraordinary remedy. One petitioning for it must show 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court. Ex parte Gates, 675 So.2d 371 (Ala. 1996).
Absent in the present case is a showing that the trial judge has refused to perform an imperative duty. Trial judges in this state have a certain amount of discretion in conducting proceedings in their courtrooms and in controlling the flow of litigation. After almost a year of litigation with respect to the arbitration issue, the trial judge decided that it would be prudent to await a ruling by this Court on Clark's mandamus petition before addressing her McCarran Act issue. For all the trial judge knew, a ruling by this Court favorable to Clark on the issue whether she had agreed to arbitrate would have made it unnecessary for him to ever reach the McCarran Act issue. We can find no abuse of discretion on the trial judge's part in merely holding Clark's amended motion to alter, amend, or vacate in abeyance pending a ruling by this Court on her mandamus petition. The writ of mandamus was never intended to be used to set aside a trial judge's ruling based on an issue that had not been properly raised at the time of the challenged ruling and on which the trial judge, exercising discretion, had postponed a decision pending a ruling from this Court that could possibly have rendered the issue moot. See Ex parte Isbell, 708 So.2d 571, 575 (Ala.1997), wherein this Court, citing Kitchens v. Maye, 623 So.2d 1082, 1088 (Ala.1993), applied in the mandamus context, the longstanding rule that an appellate court will not reverse a trial court's order on a ground raised for the first time in the appellate court. See, also, Ex parte Cypress, 275 Ala. 563, 156 So.2d 916 (1963).
The trial judge has stated on the record that he will fully consider Clark's arguments with respect to the McCarran Act once this Court has ruled on her mandamus petition. Logically, the threshold question in this case is whether state law or federal law controls the question whether the arbitration provision is valid. If state law controls, then the arbitration provision that BCBS inserted into the policy is void. This Court should not make bad procedural law in an attempt to reach important constitutional questions that have yet to be ruled on by the trial judge.
The issue that is properly before this Court is whether the trial judge clearly erred in ruling that Clark had agreed to arbitrate any claims that she might have against BCBS. In support of its motion to compel arbitration, BCBS submitted two affidavits from Melissa Brisendine, a "marketing support" manager for BCBS. The first affidavit stated in pertinent part:

*870 "Effective July 1, 1992, all C Plus contracts were amended to include, among other things, an arbitration provision. A newsletter entitled the `C Plus Update' was sent to all C Plus subscribers, including Mrs. Clark, in the summer of 1992 containing the amendment to the contract and stating that the subscribers' continued payment of premiums constituted acceptance of the amended agreement....
"In November, 1993, a revised contract containing the arbitration clause was sent along with a cover letter to all C Plus subscribers, including Mrs. Clark....
"Mrs. Clark has continued to pay her C Plus premiums up to the present."
The second affidavit, labeled as a "supplemental affidavit," stated in part:
"A newsletter entitled `C Plus Update' was mailed to all C Plus subscribers in the summer of 1992 containing the amendment to the contract and stating that the subscribers' continued payment of premiums constituted acceptance of the amended agreement. This newsletter was mailed with proper postage and with Blue Cross's proper return address to Lena Mae Clark (hereinafter `Mrs. Clark') at 214 G Street, Anniston, Alabama, 36201. This mail to Mrs. Clark was not returned to Blue Cross.
"In November, 1993, a revised contract containing the arbitration clause was sent along with a cover letter to all C Plus subscribers. Again, this revised contract was mailed with proper postage and with Blue Cross's proper return address to Mrs. Clark at 214 G Street, Anniston, Alabama, 36201. This mail to Mrs. Clark was not returned to Blue Cross."
This evidence was sufficient to create a presumption that Clark received the materials informing her of the amendment to her contract.[3] See Security Ins. Co. v. Smith, 360 So.2d 280 (Ala.1978). The record before this Court contains no evidence tending to rebut this presumption. In fact, Clark's memorandum to the trial judge in opposition to BCBS's motion to compel arbitration acknowledged that she now suffers from dementia and, therefore, that "[i]t is unknown whether [she] received or read the amended contract." What is before this Court are certain excerpts from the depositions of Clark and Billy Shelton (see n. 1). Nothing in Clark's deposition indicates whether she received and read the 1992 newsletter (with its accompanying endorsement setting out the amendment to the contract) and the 1993 revised contract. Billy Shelton testified that before 1996 Clark, although lacking a "good education," had been able to handle her own affairs. He testified as follows:
"[Clark] was able to carry on her business and all that. She did open her mail, and she did read her mail. And what she did with that mail, I don't know, because I didn't interfere with that."
Based on this sparse record, we cannot hold that Clark has a clear legal right to have the trial judge's arbitration order set aside. The method adopted by BCBS to obtain the waiver of a policyholder's constitutional right to a jury trial does cause us some concern, however. If the evidence had presented a fact question as to whether Clark had been notified of the *871 amendment; or had presented a fact question as to whether, if properly notified, she would have been unable to understand that she was agreeing to be bound by the arbitration provision; or had suggested fraud in the inducement, duress, or unconscionability, then Clark would be entitled to the writ and the issue of arbitrability would be determined by a jury.[4]Allstar Homes, Inc. v. Waters, 711 So.2d 924 (Ala.1997). (The arbitration provision does not "clearly and unmistakably" provide for the issue of arbitrability to be determined by the arbitrator. See Allstar Homes, Inc. v. Waters; First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).[5]) However, given the state of this record, and the fact that the United States Supreme Court has held that the validity of arbitration provisions is governed by general state-law contract principles, see Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), the writ is denied.
Neither this Court, nor the Alabama Legislature, has the constitutional authority to invalidate an arbitration agreement under any state law that is applicable only to arbitration provisions. In other words, neither this Court, nor the Legislature, unless it enacts a law that directly and specifically relates to insurance, can sanction an arbitration-specific limitation, such as a requirement that insurance companies obtain written consent from policyholders before amending an insurance contract through the mail by adding an arbitration provision.[6] The United *872 States Supreme Court made this clear in Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). An across-the-board state-law requirement that written consent be obtained for an amendment made to any contract through the mail, including the addition of an arbitration provision, would probably pass constitutional muster; however, in the absence of such a sweeping requirement, any arbitration-specific limitation would have to be approved by Congress.
Clark is not precluded from now raising in the trial court her McCarran Act issue as a defense to BCBS's motion to compel arbitration. Likewise, BCBS may now raise the issue whether 42 U.S.C. § 1395ss preempts state law by specifically authorizing the inclusion of arbitration provisions in Medicare Select policies. If the trial judge finds for Clark and holds that state law, not federal law, controls the arbitration issue, then BCBS may appeal from that order. A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358 (Ala.1990). If the trial judge finds for BCBS and holds that federal law authorizes arbitration provisions in Medicare Select policies in Alabama, then Clark may again seek mandamus review of the trial judge's order. Ex parte Alexander, 558 So.2d 364 (Ala.1990).
WRIT DENIED.
HOOPER, C.J., and MADDOX, HOUSTON, and SEE, JJ., concur.
COOK and BROWN, JJ., concur in the result.
KENNEDY and JOHNSTONE, JJ., dissent.
LYONS, J., recuses himself.
COOK, Justice (concurring in the result).
I concur in the per curiam opinion to the extent it postpones a decision on the applicability of the McCarran-Ferguson Insurance Regulation Act, 15 U.S.C. § 1011 et seq., until the trial court has addressed that issue. It is clear that the trial court has not yet considered it.
However, it appears that the plaintiff Mae Clark has raised another issue that the trial court has not expressly addressed. That issue is whether the language of the arbitration clause is effective to apply toretrospectivelythe tort claims asserted by Clark. Those claims are based on allegations that Blue Cross and Blue Shield of Alabama ("Blue Cross") "intentionally, deliberately, willfully, wantonly, maliciously, recklessly and/or negligently issued a Medicare supplement insurance policy to [the] Plaintiff when it knew, or should have known, that [the] Plaintiff was entitled to Medicaid benefits and, therefore, [that] the policy was worthless." Because a cause of action for the sale of a worthless policy arises upon the first premium payment, a bona fide dispute existed between Clark and Blue Cross long before it revised its policy to include the arbitration provision at issue in this action.
To be sure, parties can voluntarily agree to arbitrate disputes between themeven disputes that pre-dated the agreement to arbitrate. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kirton, 719 So.2d 201 (Ala.1998). In order to do so, however, the parties must in the arbitration clause clearly provide for that clause to have retroactive application. For example, one of the arbitration clauses in Kirton provided:
"The undersigned agrees, that all controversies which may arise between us, including but not limited to those involving any transaction or the construction, performance, or breach of this or any other agreement between us, whether entered into prior [to], on, or subsequent to the date hereof shall be determined by arbitration."
719 So.2d at 202 (emphasis added in Kirton). In contrast to the clear, express provisions involved in Kirton, the arbitration *873 clause in this case provides in pertinent part:
"You have agreed to submit all claims or disputes you have that arise out of, or are in any way related to, the Contract, including any claims you may have against preferred or participating health care providers for medical care rendered pursuant to your Contract, for final and binding resolution by arbitration."
Thus, the question presented is whether this clause is, as a matter of law, clear enough to subsume Clark's preexisting dispute, and, if so, whether Clarkby any action or inaction"knowingly, willingly, and voluntarily" assented to such a result. See Allstar Homes, Inc. v. Waters, 711 So.2d 924, 929 (Ala.1997). For these reasons, I concur in the result.
KENNEDY, Justice (dissenting).
Although I agree that the issue relating to the McCarran-Ferguson Act is not yet properly before this Court, I believe Clark did not agree to waive her constitutional right to a jury trial and to arbitrate her claims against BCBS. Based on this independent ground, I would grant Clark's petition for a writ of mandamus and I would pretermit discussion of the McCarran Act issue.
Clark argues that no matter which law is applied, federal or state, arbitration should not be compelled because, she argues, she did not agree to arbitrate her claims against BCBS. In particular, Clark emphasizes the fact that she did not sign an agreement to arbitrate and argues that her silence with regard to the newsletter cannot be deemed as an acceptance of the arbitration clause. Clark argues that BCBS's attempt to unilaterally amend her insurance contract to include an arbitration clause, by sending notice through the mail, contradicts current caselaw. Clark contends that any waiver of the right to trial by jury, which is guaranteed by the United States and Alabama Constitutions, must be clear and unequivocal.
It is for the courts to determine whether there is clear and unmistakable evidence of an agreement to arbitrate. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Alabama courts have emphasized that "any arbitration agreement is a waiver of a party's right under Amendment VII of the United States Constitution to a trial by jury and, regardless of the federal courts' policy favoring arbitration, we find nothing in the FAA that would permit such a waiver unless it is made knowingly, willingly, and voluntarily." Allstar Homes, Inc. v. Waters, 711 So.2d 924, 929 (Ala. 1997).
"States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause `upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2." Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).
BCBS maintains that Clark must arbitrate her claims, based on Ex parte Rager, 712 So.2d 333 (Ala.1998), and Ex parte Dyess, 709 So.2d 447 (Ala.1997). In Rager, the plaintiff applied for a "hospital accident policy" with the insurer. The insurer approved the plaintiffs application and mailed him a copy of the policy. Attached to the policy was an endorsement that contained an arbitration clause. Later, when a dispute arose, the plaintiff argued that he should not be forced to arbitrate because the application did not mention arbitration and he did not sign the endorsement containing the arbitration provision. The policy included a clause that allowed the plaintiff to cancel the contract within 10 days, at no cost, if he did not approve of its terms. We held that, by not returning the policy, the plaintiff agreed to the terms, including the arbitration clause contained in the endorsement.
In this present case, after Clark had already applied for insurance and had been accepted as an insured, BCBS, in a newsletter, attempted to unilaterally amend the policy. This case is thus distinguishable *874 from Rager, where the arbitration clause was attached to the original policy from the outset; Clark's original policy did not contain an arbitration clause. BCBS later, through the mailing of a newsletter and the subsequent mailing of a revised policy, attempted to add an arbitration clause to the already existing contract. Therefore, Rager is distinguishable.
In Dyess, supra, 709 So.2d 447, the plaintiffs, while test-driving an automobile belonging to an automobile dealer, were involved in an accident. The accident was caused by an unidentified driver. The plaintiffs sued the automobile dealer's insurance company, under the uninsuredmotorist provision of its policy. The policy contained an arbitration clause. We held that the plaintiffs could be compelled to arbitrate even though they were nonsignatories to the insurance contract because, in effect, the plaintiffs were claiming as third-party beneficiaries of the contract.
Dyess is distinguishable from this present case because Dyess involved third-party beneficiaries whose only means of recovery was through the contract between the original parties, which included an arbitration agreement. The holding of Dyess would not apply to this present case, where one of the parties to the original contract disputes the unilateral amendment of the contract to add an arbitration provision that she had not previously agreed to.
Moreover, I note that in Ex parte Beasley, 712 So.2d 338 (Ala.1998), the plaintiff was employed by a hospital. The hospital adopted a new employment policy that required employees to submit all employment claims to binding arbitration. Although the plaintiff was already employed with the hospital when the new policy was implemented, her continued employment was conditioned upon her acknowledging the receipt of the new employee handbook an arbitration clause appeared in the body of that handbook. The plaintiff signed a form acknowledging that she had received the handbook. We held that the plaintiff had not agreed to arbitrate her claims.
The instant case is substantially similar to Beasley. Just as the hospital's attempt to include an arbitration clause through the employee's acknowledgment that she had received a new handbook with an arbitration clause in it failed, BCBS's attempt to include an arbitration clause through the mailing of a newsletter must also fail. BCBS's mailing of a revised contract containing an arbitration clause is no different from the hospital's attempt to include an arbitration clause in the new employee handbook.
At oral argument, counsel for one of the amici curiae, conceded that the constitutional right to a jury trial in a civil case is generally waivable. However, he argued that the waiver of the right to trial by jury should not be easily inferred by the courts. Counsel argued that the court's willingness to conclude that parties have, by accepting binding arbitration, waived their constitutional rights, cannot be reconciled with the protective attitude usually taken by the courts toward the waiver of constitutional rights in the criminal context. For example, when a criminal defendant decides to plead guilty, the trial court must undertake a factual inquiry to determine if the defendant is making the plea voluntarily with an understanding of the nature of the charge and of the consequences of the plea, including the defendant's waiver of his right to trial by jury. Additionally, the criminal defendant must sign a form that clearly states that he is waiving his right to trial by jury.
Amicus counsel cited two United States Supreme Court cases regarding the waiver of rights in a civil context. In D.H. Overmyer Co. v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), a contractor that repeatedly failed to make payments that were due to a subcontractor for installation of a refrigeration system signed a cognovit in order to continue in the contractual relationship. "[A] cognovit is the ancient legal device by which the *875 debtor consents in advance to the holder's obtaining a judgment without notice or hearing, and possibly even with the appearance, on the debtor's behalf, of an attorney designated by the holder." 405 U.S. at 176, 92 S.Ct. 775.[7] The subcontractor, alleging that the contractor had again failed to make a payment, attempted to enforce the cognovit. In response, the contractor argued that it had been deprived of due process, specifically, notice and a hearing, prior to the entry of a judgment. The Supreme Court refused to determine the appropriate standard for assessing the validity of waiver of due process in the civil context. It held, instead, that, even applying the standard of Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (a "voluntary[,]... knowing, [and] intelligent" standard); or the standard of Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (an "intentional relinquishment or abandonment of a known right" standard), the contractor had waived its due-process rights of notice and a hearing. The Court discussed the specific facts of the case, noting that it was not a case of unequal bargaining power, because the contractor had been party to "tens of thousands of contracts." 405 U.S. at 186, 92 S.Ct. 775. The Court also concluded that it was not a contract of adhesion, because there was no refusal on the subcontractor's part to deal with the contractor unless the contractor agreed to the cognovit. The Court emphasized that the contractor and its attorney were well aware of the significance of the cognovit. 485 U.S. at 186-87, 108 S.Ct. 950. Initially, the contractor did not sign the cognovit and it did so later only to preserve its business relationship with the subcontractor. The Court, in looking at the cognovit, emphasized that the contractor had received consideration for its waiver of rights under the cognovit. The Court stated, regarding the waiver of constitutional rights: "[O]ur holding, of course, is not controlling precedent for other facts of other cases. For example, where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the cognovit provision, other legal consequences may ensue." 405 U.S. at 188, 92 S.Ct. 775.
In Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), decided just a few months after Overmyer, the Court answered the question whether Florida and Pennsylvania's prejudgment replevin procedures violated the Fourteenth Amendment's guarantee that no State shall deprive any person of property without due process of law.[8] Margarita Fuentes purchased a gas stove, a stereo, and a service policy from Firestone Tire and Rubber Company under a conditional sales contract that required her to make monthly payments. As part of the sales contract, Fuentes was required to sign a form sales contact providing that "in the event of default of any payment or payments, Seller at its option may take back the merchandise." 407 U.S. at 94, 92 S.Ct. 1983. After a dispute arose regarding the servicing of the stove, Fuentes refused to make her remaining payments. Firestone used Florida's law to obtain a writ of replevin that allowed it to seize the goods the dispute related to. Fuentes sued in a federal court, arguing that the seizure had denied her of due process of law because the contract had allowed Firestone to obtain her property without giving her adequate notice or an opportunity to challenge the issuance of the writ. Firestone argued that Fuentes had waived her procedural rights by signing the sales agreement. The Court stated as follows:
"In D.H. Overmyer Co. v. Frick Co., 405 U.S. 174[, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972)], the Court recently outlined the considerations relevant to determination of a contractual waiver of due *876 process rights. Applying the standards governing waiver of constitutional rights in a criminal proceedingalthough not holding that such standards must necessarily applythe Court held that, on the particular facts of that case, the contractual waiver of due process rights was `voluntarily, intelligently, and knowingly' made. Id., at 187[, 92 S.Ct. 775]. The contract in Overmyer was negotiated between two corporations; the waiver provision was specifically bargained for and drafted by their lawyers in the process of these negotiations. As the Court noted, it was `not a case of unequal bargaining power or overreaching. The Overmyer-Frick agreement, from the start, was not a contract of adhesion.' Id., at 186[, 92 S.Ct. 775]. Both parties were `aware of the significance' of the waiver provision. Ibid.

"The facts of the present cases are a far cry from those of Overmyer. There was no bargaining power over contractual terms between the parties who, in any event, were far from equal in bargaining power. The purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale. The appellees made no showing whatever that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights.
"The Court in Overmyer observed that `where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the [waiver] provision, other legal consequences may ensue.' Id., at 188[, 92 S.Ct. 775]. Yet, as in Overmyer, there is no need in the present cases to canvass those consequences fully. For a waiver of constitutional rights in any context must, at the very least, be clear...."
Fuentes, 407 U.S. at 94-95, 92 S.Ct. 1983 (emphasis original).
The Supreme Court emphasized in Fuentes hat while the contract provided the seller with the right to repossess the stove, it did not specify that the repossession would be without notice and a hearing, and, therefore, that the contract did not waive Fuentes's constitutional rights.
Although the Supreme Court in Overmyer and Fuentes did not set out a specific test for reviewing the question of a waiver of rights in a civil context, counsel in this present case have urged this Court to adopt a four-factor test set out in a recent law-review article. See Jean R. Sternlight, Rethinking the Constitutionality of the Supreme Court's Preference for Binding Arbitration: A Fresh Assessment of Jury Trial, Separation of Powers, and Due Process Concerns, 72 Tul. L.Rev. 1 (1997). Professor Sternlight contends that the courts "have ... allowed themselves to be swayed by a mythical vision of consensual arbitration, rather than by reality." 72 Tul. L.Rev. at 39. Based on the guidelines set out in Fuentes and Overmyer, Professor Sternlight suggests the following four factors for reviewing an arbitration agreement: (1) Was the agreement clear enough? (2) Was the agreement fraudulently procured? (3) Was the agreement entered into voluntarily? and (4) Was the agreement substantively unfair? 72 Tul. L.Rev. at 26-39.
The first factorWas the agreement clear enough?pertains to whether the agreement clearly states that the parties are waiving their right to a day in court. Professor Sternlight contends that "[a]lthough many courts have held that it is `obvious' that one waives a jury trial by accepting arbitration, in this author's experience even law students may be unaware that an acceptance of binding arbitration is a rejection of trial." 72 Tul. L.Rev. at 27. Reviewing the agreement for clarity would also include addressing whether the arbitration clause itself is explained in confusing terms and whether the dispute was actually covered by the arbitration clause.
The second factorWas the agreement fraudulently procured?requires reviewing whether a person was induced by misrepresentations to sign the agreement. Professor Sternlight notes that courts have *877 been reluctant to hold company representatives liable for fraud for failing to thoroughly disclose the details of an arbitration clause, no matter how great the difference in knowledge or power between the parties.
With regard to the third factorWas the agreement entered into voluntarily? Professor Sternlight suggests that courts "often appear so taken with the myth of voluntary arbitration that they fail to look realistically at whether the protesting party actually had an option to reject the agreement." 72 Tul. L.Rev. at 33.
As to the fourth factorWas the agreement substantively unfair?Professor Sternlight notes that courts have been "somewhat more willing to void arbitration agreements for ... substantive unfairness." 72 Tul. L.Rev. at 39. Professor Sternlight contends that it is often unclear whether the parties have knowingly exchanged their litigation rights for arbitration:
"Instead, often in these cases a large company may have used its superior knowledge and power to impose an arbitration clause providing the company with a dispute-resolution advantage consisting of biased arbitrators; the opportunity for substantial delay; in terms of geography or cost, a forum that is much more favorable for the opponent; limitations on discovery, damages, injunctive relief, opportunity to form class actions or appellate review; a shortening of the statute of limitations; or a one-sided agreement that requires one party to arbitrate all its claims but allows the other the chance to take certain claims to court."
72 Tul. L.Rev. at 36-39.
Although I would stop short of adopting the test proffered by Professor Sternlight, I do believe that Clark did not agree to the arbitration provision BCBS attempted to include in her policy by unilateral amendment. Therefore, I respectfully dissent. Clark's petition for a writ of mandamus should be granted and the trial court directed to vacate its order compelling arbitration of Clark's claims against BCBS.
JOHNSTONE, J., concurs.
NOTES
[1] This petition for the writ of mandamus arises out of an action filed by Mae Clark in the Etowah Circuit Court. On November 4, 1997, she amended her complaint to add as a plaintiff her nephew, Billy Shelton, who has a power of attorney to deal with Ms. Clark's business. Billy Shelton is also named as a petitioner along with Ms. Clark.
[2] Clark alleged that BCBS had wrongfully sold her the Medicare-supplement policy, basing that allegation on a claim that the policy BCBS sold her was worthless because she was eligible for Medicaid benefits.
[3] The record contains a copy of a 1992 newsletter. Contrary to Brisendine's affidavit, however, that copy does not state "that the subscribers' continued payment of premiums constituted acceptance of the amended agreement." Clark's insurance contract provided:

"By giving 30 days written notice to you, or your group, we may change the fees you pay for coverage under this Contract or any provision of this Contract. If you pay any fees after the notice, you thereby accept the new fees or changes in the Contract.
"The Contract can only be changed by written amendments, endorsements, and revisions signed by one of our officers and sent by us to you or your group. None of our officers, employees or agents can make any oral changes, such as by telephone. Nor may anyone waive or vary any provisions of this Contract except in writing, signed by one of our officers."
[4] Although BCBS argues strenuously to the contrary, we do not believe Clark waived her right to a jury determination of arbitrability by waiting too long to assert her rights. In her initial response to BCBS's motion to compel arbitration, Clark stated:

"[BCBS's] motion to dismiss [or, in the alternative, to compel arbitration] should be denied as a matter of law for the reasons stated below. In the alternative, the Court should set a jury trial to determine if the arbitration clause is an enforceable contract."
[5] The arbitration provision states:

"If, after exhausting the internal review procedures set forth above in Paragraphs A through E, you are still not satisfied with the resolution of your complaint, the parties shall resolve their disputes through binding arbitration pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. § 1, et seq., and in accordance with the rules and procedures set forth in the American Arbitration Association's Dispute Resolution Program for Arbitration Of Insurance Claims disputes. If you request arbitration of this dispute, you will be provided with a copy of the rules and procedures of the American Arbitration Association, or you may request a copy at any time by writing to us at the address listed in Paragraph D....
"You have agreed to submit all claims or disputes you have that arise out of, or are in any way related to, the Contract, including any claims you may have against preferred or participating health care providers for medical care rendered pursuant to your Contract, for final and binding resolution by arbitration. Submitting all such claims to binding arbitration in exchange for the increased coverage and benefits available under the C Plus Medicare Select Contract prohibits you from filing any action in law or equity for breach of contract or tort prior to the rendering of the arbitration award. Once the arbitration award is entered, judgment upon the award may be entered in any Court having jurisdiction thereof. In accordance with the provisions of the Federal Arbitration Act, 9 U.S.C. § 1, et seq., the award entered by the arbitrator shall not be set aside except upon the grounds set forth in the Federal Arbitration Act.
"If your complaint arises out of or relates to medical care or services you received from a PMD physician or other Preferred Care Provider, the Medical Director or designee will forward your complaint to a neutral arbitrator.
"While Blue Cross and Blue Shield of Alabama has made these binding arbitration procedures available to the parties, Blue Cross and Blue Shield has no responsibility for your selection of a health care provider, nor for the quality of care rendered. Any award made at any stage of the arbitration proceeding is the responsibility of the health care provider and not of Blue Cross and Blue Shield of Alabama."
[6] See Humana Inc. v. Forsyth, 525 U.S. 299, 119 S.Ct. 710, 716, 142 L.Ed.2d 753 (1999) (noting that the McCarran-Ferguson Act precludes the application of a federal statute that is not specifically related to the business of insurance if that statute would invalidate, impair, or supersede a state law that was enacted for the purpose of regulating the business of insurance).
[7] Alabama disallows cognovits. Ala.Code 1975, § 8-9-11.
[8] The Florida case and the Pennsylvania case had similar claims. The Supreme Court focused on the facts in the Florida case.