803 So.2d 519 (2001)
BLUE CROSS AND BLUE SHIELD OF ALABAMA
v.
Shirley WOODRUFF, as daughter and next friend of Vera Brooks, et al.
1992385.
Supreme Court of Alabama.
May 18, 2001.
*520 W. Pemble Delashmet of Pierce, Ledyard, Latta & Wasden, P.C., Mobile; and Cavender C. Kimble, Leigh Anne Hodge, and F. Inge Johnstone of Balch & Bingham, L.L.P., Birmingham, for appellant.
Sidney W. Jackson III and Stephen L. Klimjack of Jackson, Taylor, Martino & Hedge, P.C., Mobile, for appellees.
HARWOOD, Justice.
Shirley Woodruff, as daughter and next friend of Vera Brooks,[1] and "Vera Brooks, on behalf of herself and all others similarly situated," filed this action in the Mobile Circuit Court. The plaintiffs allege that Blue Cross and Blue Shield of Alabama ("Blue Cross") issued Medicare-supplement insurance policies to Brooks and to other members of a putative class and collected premiums from them when it knew, or should have known, that the policies duplicated benefits they were entitled to receive from Medicaid. Blue Cross moved to compel arbitration and also requested *521 that the trial proceedings be stayed pending arbitration. With its motion, Blue Cross filed a supporting affidavit of Melissa Brisendine, in her capacity as "manager, marketing support" of Blue Cross. The trial court denied the motion. Blue Cross appeals.
From the information in Ms. Brisendine's affidavit, we can extract the following history of Brooks's contract with Blue Cross. Beginning April 15, 1978, Brooks was covered under a Blue Cross policy referred to as a "C Plus with PMD Medicare Supplement Contract" ("C Plus policy"), a Medicare-supplement policy regulated by federal laws. Brooks's policy was an individual policy; it was not issued pursuant to any group health-insurance coverage. On March 15, 1992, federal legislation regulating Medicare-supplement policies issued after that date, including C Plus policies, took effect. Pursuant to that federal legislation, the Alabama Department of Insurance adopted Regulation No. 71; that regulation required that Medicare-supplement policies contain a procedure for grievances and appeals and allowed for the inclusion of arbitration provisions in the policies.
Effective July 1, 1992, the C Plus policy was amended to include an arbitration provision. A newsletter entitled "C Plus Update" was mailed to all C Plus subscribers, including Brooks, in the summer of 1992; it included a copy of the "Endorsement to the C Plus with PMD contract effective July 1, 1992," which, in turn, included a section entitled "Final and Binding Nature of Arbitration Procedure." In her affidavit, Ms. Brisendine states that the newsletter informed the subscribers that their continued payment of premiums "constituted acceptance of the agreement" to submit all claims or disputes to arbitration. (The newsletter contains no such provision. That provision appears only in the policy and relates to revisions to the contract in general, not to arbitration specifically.)
In November 1993, a revised policy containing an arbitration clause was sent, along with a cover letter, to all C Plus subscribers, including Brooks; Brooks continued to pay premiums until her C Plus coverage terminated in 1997. Attached as Exhibit B to Brisendine's affidavit is a copy of Ms. Brooks's C Plus policy as it read immediately before the amendment ("the 1991 contract"). Although the date of the 1991 contract was not otherwise shown, the last page indicated that the contract had been revised in January 1991. Attached as Exhibit D to Brisendine's affidavit is a copy of the revised policy that was sent out in November 1993 ("the 1993 contract").
The 1991 contract did not contain an arbitration provision. It did contain the following provisions relating to future changes in the provisions of the contract:
"Contract Revisions:
"B. By giving 30 days written notice to you, or your group, we may change the fees you pay for coverage under this Contract or any provision of this Contract. If you pay any fees after the notice, you thereby accept the new fees or changes in the contract.
"The Contract can only be changed by written amendments, endorsements, and revisions signed by one of our officers and sent by us to you or your group. None of our officers, employees, or agents can make any oral changes, such as by telephone. Nor may anyone waive or vary any provisions of this Contract except in writing, signed by one of our officers.
"Notice:
"From us to you:

*522 "We give you notice when we mail it to you at the last address we have for you in our records...."
By deposition taken on November 2, 1999, Woodruff testified to the following circumstances involving her mother's personal history, including the condition of her eyesight and her mental condition. Woodruff and her husband moved Brooks into their home in Theodore in March or April 1995. From 1987 until that move, Brooks had lived in Greenville with Annie McCrary, a former employer and longtime friend who was two years older than Brooks and whose husband had passed away. Before she moved in with the Woodruffs, Brooks had been capable of handling her own affairs, but McCrary had handled her checkbook because Brooks suffered from macular degeneration and she could not see to read. Woodruff could not remember exactly when Brooks became unable to see well enough to read, but she estimated it was "at least 9-10 years" before her 1999 deposition. Woodruff also answered affirmatively when asked if "[t]hat would take us back to about 1985 or 1986, roughly, is when she started having problems with her vision?" Woodruff testified that before that, although Brooks had not completed high school, "she could read and write very good" and that "she loved to read." When Woodruff was gathering her mother's possessions at the home she shared with Mrs. McCrary in Greenville in preparation for her move to Theodore, Woodruff did not find any policies or other paperwork from Blue Cross, other than Brooks's Blue Cross insurance card and some explanation-of-benefit forms. Woodruff speculated that Brooks may have thrown away any other materials she might have received from Blue Cross.
By the time she moved to Theodore, Brooks was not able to keep track of her own papers and Mrs. McCrary was reading to her because Brooks's failing vision made it impossible for her to read. Woodruff could not speculate on who, as between Mrs. McCrary and Brooks, decided what documents needed to be kept and what needed to be thrown away, "because [she] wasn't there." She never asked Mrs. McCrary where any other materials relating to Blue Cross might be. Although she needed Mrs. McCrary's assistance in writing checks and reading, Brooks handled her own affairs while she lived with Mrs. McCrary. Woodruff testified that she had asked her mother if she had ever received a C Plus policy or any correspondence related to it and that "she doesn't remember anything." Brooks does not remember "how she got on C Plus" and she does not remember if she ever received a policy. Woodruff indicated that she has never asked Brooks if she had gotten any newsletters or other correspondence from Blue Cross, but that she does not believe that "right now" Brooks would remember whether she had. Woodruff described her mother as having "what they call shortterm memory," meaning "[l]ike if you tell her something go back five minutes, she's forgot it." When asked about her mother's memory for details "going back 10-15 years," Woodruff explained, "she can't remember anything like that ... as far as any kind of business," but she can remember things "like family." Questioned as to when Brooks had become incapable of handling her affairs, Woodruff answered, "[W]ell I would say before 1995, before I moved her in with me." Defendant's exhibit 11 to the Woodruff deposition is a November 7, 1995, letter from Daniel M. Rencher III, M.D., an ophthalmologist, attesting that "Ms. Vera Brooks is legally blind in each (both) eyes. Best corrected visual acuity is finger counting less than 20/400 (each eye)."
*523 It appears likely that in the summer of 1992, Brooks would not have been able to read the "C Plus Update" newsletter sent to all C Plus subscribers, and that she likewise may not have been able to read the 1993 contract when it was sent to her and all other C Plus subscribers in November 1993. However, nothing in the record suggests that those documents were not sent to the address Blue Cross had for Brooks in its records, that of the house she shared with Mrs. McCrary in Greenville; nor is there any indication that the documents were not delivered to that address or that they did not come to Brooks's attention.
On July 5, 2000, the trial judge conducted a hearing on Blue Cross's motion. Julia K. Simpson, unit manager in the customer-accounts department of Blue Cross, testified that at the time of the 1992 amendment to the 1991 contract, Blue Cross's records reflected that Brooks's address was 271 Executive Drive, Greenville, Alabama, which Woodruff had stated in her deposition was Mrs. McCrary's address. Ms. Simpson further testified that when Brooks moved in with Woodruff, Blue Cross received a notice of a change of address for Brooks, changing her address to 7071 Woodside Road, Theodore, Alabama. Ms. Simpson further testified that until 1993, Brooks made all of her premium payments by "coupon" and that in 1993 "she went on bank draft." Brooks continued paying premiums after the amendment to the 1991 contract adding the arbitration provision, until her contract terminated in 1997.
Woodruff also testified at the hearing, stating that Brooks was at that time 88 years old, was living in the Springhill Senior Residents Nursing Home, was legally blind, and could not hear. She further testified that "[s]he has severe dementia. I think I saw `Alzheimer's' on the report the other day." She reaffirmed her deposition testimony that before 1995 Brooks had managed her own affairs. She also reaffirmed her earlier testimony that she had been unable to locate any arbitration agreement or a policy containing an arbitration agreement that her mother might have received from Blue Cross, but she could not say that her mother had never received or read any such materials.
During the proceedings before the trial court, and again in briefs submitted to this Court, the plaintiffs advanced numerous "defenses" and arguments as to why the case should not be submitted to arbitration. These included arguments that the contract lacked sufficient involvement with interstate commerce to be subject to arbitration under the Federal Arbitration Act; that Blue Cross lacked authority under the contract provision authorizing revisions to the contract to add a totally new provision to the contract, as opposed to changing an existing one; that the contract was "illusory"; that there had been no real consideration for entering the arbitration agreement; that the arbitration clause was "hidden"; that the contract was one of adhesion; that the arbitration provision was unconscionable; that the contract should be rescinded; that Blue Cross had waived its right to arbitrate; and that there was no voluntary agreement by Brooks to enter the arbitration agreement. At oral argument in this Court, however, the plaintiffs for the first time advanced the argument that Blue Cross did not follow its own explicitly described procedure for amending Brooks's contract to add the arbitration clause, because, they said, the 1991 contract states that it can "only be changed by written amendments, endorsements, and revisions signed by one of our officers and sent to you." The plaintiffs pointed out that neither the "C Plus Update" newsletter, mailed to Brooks in the summer of 1992, *524 nor the 1993 contract, sent to her in 1993, bore a signature of any officer of Blue Cross. Close review of those materials as they appear in the record confirms that neither bears a signature of an officer of Blue Cross. In response to the argument that this specific issue had not been presented to the trial judge, the plaintiffs pointed out that Blue Cross had the burden of proving the existence of a valid contract providing for arbitration.
Indeed, "[i]n order for [the Federal Arbitration Act] to apply and preemption to occur, (1) there must be a valid, written arbitration agreement and (2) the contract in which the arbitration agreement appears must relate to a transaction involving interstate commerce." Southern Energy Homes, Inc. v. Harcus, 754 So.2d 622, 625 (Ala.1999) "[A]rbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute he has not agreed to submit." Ex parte Roberson, 749 So.2d 441 (Ala.1999) (summarizing the holding of A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358, 362 (Ala.1990)). Accordingly, a trial court must first "determine whether there was a valid enforceable arbitration agreement that applied to the dispute." Ex parte McKinney, 515 So.2d 693, 694 (Ala.1987). "Federal substantive law provides that the question of whether the parties agreed to arbitrate their dispute is to be governed by ordinary state law principles correlating to the formation of contracts." Ex parte Roberson, 749 So.2d at 445. This Court succinctly summarized the burden of proof in this regard in note 4 to its opinion in Ex parte Caver, 742 So.2d 168, 172 (Ala.1999):
"A motion to compel arbitration is analogous to a motion for a summary judgment. The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract involves a transaction affecting interstate commerce. Once such a prima facie showing has been made, the burden shifts to the party opposing arbitration to present some evidence indicating that there is no arbitration agreement subject to specific enforcement under the [Federal Arbitration Act]. If the party opposing arbitration presents sufficient evidence to create a fact question as to the existence of a valid arbitration agreement, then the issue must be resolved by the trial court or by a jury, if one is requested."
(Citations omitted.)
Accordingly, Blue Cross had the burden of proving, among other things, the existence of a valid contract containing an agreement to arbitrate. "In reviewing a trial court's refusal to compel arbitration, this Court's review is de novo," as to the trial court's ruling on questions of law. Kenworth of Dothan, Inc. v. Bruner-Wells Trucking, Inc., 745 So.2d 271, 273 (Ala. 1999). Further, "[w]hen a trial judge's ruling is not based substantially on testimony presented live to the trial judge, review of factual issues is de novo." Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869, 871 (Ala.1999). However, where, as here, the trial judge heard oral testimony, the ore tenus standard applies and there is a presumption of correctness with respect to the court's factual findings.
"An order refusing to compel arbitration is generally reviewed de novo. However, we recognize an exception to this general rule. In cases such as this one, where in ruling on the motion to compel arbitration a trial court hears ore tenus evidence and makes findings of fact based on that evidence, its order will not be set aside on appeal unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Jasper City *525 Council v. Woods, 647 So.2d 723 (Ala. 1994). Absent live testimony, the trial court's findings of fact carry no presumption of correctness and we will review the trial court's factual and legal conclusions de novo. Justice v. Arab Lumber & Supply, Inc., 533 So.2d 538 (Ala.1988)."
Williams, Inc. v. Ivey, 777 So.2d 94, 98 (Ala.2000). See also Ex parte Roberson, supra.
It is unfortunate that the plaintiffs did not raise in the trial court, or even later in briefs submitted to this Court, the specific issue they raised at oral argument: whether there was a valid agreement to arbitrate, in light of Blue Cross's noncompliance with the "contract revision" clause in the 1991 contract, which states that "the Contract can only be changed by written amendments, endorsements, and revisions signed by one of our officers and sent by us to you." Nonetheless, the issue was explicitly argued at oral argument, and we are now obliged to address it, even though it might not have been the basis for the trial judge's order denying arbitration.
"The appellate courts will affirm the ruling of the trial court if it is right for any reason, even one not presented to or considered by the trial judge. McKenzie Methane Corp. v. M-W Drilling, 653 So.2d 982, 984 (Ala.1995), and Smith v. Equifax Services, Inc., 537 So.2d 463 (Ala.1988). Moreover, we will not reverse the trial judge's denial of a motion to compel arbitration unless it is clearly erroneous. Ryan Warranty Services, Inc, v. Welch, 694 So.2d 1271 (Ala. 1997)."
Premiere Chevrolet, Inc. v. Headrick, 748 So.2d 891, 893 (Ala.1999) (six Justices concurred in that portion of the main opinion containing the quoted text and three Justices concurred in the result in that case).
In construing an arbitration clause, a court must resolve any ambiguities as to the scope of the agreement in favor of arbitration. This is so because "[w]hen an arbitration agreement is at issue... the [Federal Arbitration Act] precludes a court from applying general rules of contract construction in a manner that would disfavor arbitration." Birmingham News Co. v. Lynch, 797 So.2d 440, 443 (Ala.2001). However, "[f]ederal substantive law provides that the question of whether the parties agreed to arbitrate their dispute is to be governed by ordinary state law principles relating to the formation of contracts." Ex parte Roberson, 749 So.2d at 445.
In Premiere Chevrolet Inc. v. Headrick, supra, Headrick had leased an automobile from Premiere Chevrolet pursuant to a "lease agreement" signed by both parties. The lease agreement contained a clause providing that the lease constituted the entire agreement between the parties and providing further that "no other agreement between you and us will be binding unless in writing and signed by you and us." The lease agreement itself did not contain any arbitration provision, but "a buyer's order," which Headrick also signed, did contain an arbitration provision. However, this Court stated:
"While the `buyer's order' is signed by Headrick, it is not signed by any representative of Premiere, although it bears signature lines for that purpose and contains one provision stating that `this order is not valid unless signed and accepted by Premiere Chevrolet, Inc.' (emphasis added [in Premiere Chevrolet]), and a second provision stating that `this order shall not become binding until accepted by the dealer or his authorized representative.'"
748 So.2d at 893.
Headrick sued Premiere Chevrolet, alleging fraud and breach of contract. Premiere *526 Chevrolet filed a motion to compel arbitration. Headrick amended her complaint to include claims alleging fraudulent suppression, theft by deception, and unjust enrichment, and further alleging that the buyer's order was void for "lack of mutuality." The trial judge initially granted Premiere Chevrolet's motion to compel, but upon reconsideration set aside that order, denied the motion to compel arbitration, and then denied Premiere Chevrolet's subsequent motion to set aside the new order. Premiere Chevrolet appealed. Headrick argued on appeal that "because the buyer's order was never signed by any agent of Premiere and thus was never fully executed, no agreement to arbitrate ever came into existence." 748 So.2d at 893. Relying principally on our opinion in Med Center Cars, Inc. v. Smith, 727 So.2d 9 (Ala. 1998), this Court upheld the trial court's order denying arbitration, pointing out that the lease agreement clearly provided that it was the sole agreement between the parties and that no other agreement between the parties would be binding unless it was in writing and signed by both parties.
"Moreover, the buyer's order requires both acceptance and a signature by Premiere. As already revealed, the buyer's order provides: `This order is not valid unless signed and accepted by Premiere....' (Emphasis added [in Premiere Chevrolet].) The requirements for signature and acceptance are conjunctive, not disjunctive. This document, drafted and imposed by Premiere, must be construed strictly against the drafter, Lilley v. Gonzales, 417 So.2d 161 (Ala.1982), and Jewell v. Jackson & Whitsitt Cotton Co., 294 Ala. 112, 313 So.2d 157 (1975), so as to require the signature of Premiere in addition to acceptance by Premiere."
748 So.2d at 894-95. See also Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869, 872 (Ala.1999).
"This Court has clearly and consistently held that `"a party cannot be required to submit to arbitration any dispute he has not agreed to submit."'" Ex parte Stallings & Sons, Inc., 670 So.2d 861, 862 (Ala. 1995) (quoting Old Republic Ins. Co. v. Lanier, 644 So.2d 1258, 1260 (Ala.1994), quoting in turn A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358, 362 (Ala.1990)).
We conclude that the trial court would not have been in error had it determined that, with respect to the attempted revisions of the C Plus policy in 1992 and 1993, Blue Cross did not comply with the precondition it established in the 1991 contract, i.e., that that contract could be changed only "by written amendments, endorsements, and revisions signed by one of our officers and sent by us to you." Our holding is necessarily predicated on the evidence before the trial court when it denied arbitration. Although counsel for Blue Cross asserted at oral argument, after counsel for Brooks had raised the issue we now address, that appropriately signed amendatory documents had been filed with the Department of Insurance, he acknowledged that those documents were not before the trial judge and are not a part of the record before this Court. Although the plaintiffs did not argue at trial that there was no proof of an amendment, endorsement, or revision "signed by one [Blue Cross's] officers and sent by [it] to [Brooks]," Blue Cross had the burden of proving, nonetheless, the existence of a valid written arbitration agreement. In this case, Blue Cross explicitly stated in the 1991 contract that that contract could be changed only by written amendments, endorsements, or revisions signed by one of its officers and sent by it to the policyholder; failure of proof in that regard was *527 fatal to Blue Cross's attempt to prove the existence, in the form of the July 1, 1992, endorsement to the C Plus policy and the 1993 revised C Plus policy, of a valid enforceable arbitration agreement.
In its briefs and in oral argument to this Court, Blue Cross called our attention to our opinion in Ex parte Shelton, 738 So.2d 864 (Ala.1999), in which we upheld an order of the trial court compelling arbitration pursuant to the same 1993 contract now before us, preceded by the same 1992 newsletter. That case is distinguishable from the present case, however, for the following reasons. First, because Shelton sought relief from an order compelling arbitration, he petitioned for a writ of mandamus, an extraordinary remedy that requires a showing of, among other things, a clear legal right in the petitioner to the order sought, an imperative duty upon the respondent to perform, and a refusal to do so. Ex parte Empire Fire & Marine Ins. Co., 720 So.2d 893 (Ala.1998). Therefore, the issue before us in Shelton was "whether the trial judge clearly erred in ruling that [the plaintiff] Clark had agreed to arbitrate any claims that she might have against [Blue Cross]." 738 So.2d at 869. In a four-Justice per curiam opinion, with two Justices concurring in the result, two Justices dissenting, and one Justice recusing himself, we stated:
"Based on this sparse record, we cannot hold that Clark has a clear legal right to have the trial judge's arbitration order set aside. The method adopted by [Blue Cross] to obtain the waiver of a policyholder's constitutional right to a jury trial does cause us some concern, however. If the evidence had presented a fact question as to whether Clark had been notified of the amendment; or had presented a fact question as to whether, if properly notified, she would have been able to understand that she was agreeing to be bound by the arbitration provision; or had suggested fraud in the inducement, duress, or unconscionability, then Clark would be entitled to the writ and the issues of arbitrability would be determined by a jury.... However, given the state of this record, and the fact that the United States Supreme Court has held that the validity of arbitration provisions is governed by general state-law contract principles, the writ is denied."
738 So.2d at 870-71 (citations and footnote omitted).
Second, unlike the plaintiff in Shelton, the plaintiffs in the present case have raised the issue whether Blue Cross complied with its own requirement that amendments to the 1991 contract be signed by one of its officers. Although the identical 1991 contract provisionallowing a change of the contract upon 30-day written notice by a written amendment signed by one of Blue Cross's officers and sent to the policyholderwas involved in Shelton, as noted in note 3 in that opinion, the plaintiff, in resisting arbitration, did not argue that Blue Cross had not complied with the requirement that the written contract amendment, signed by one of its officers, be sent to the policyholder.
Third, in Shelton, the petitioner did not challenge the validity of Blue Cross's attempted amendment of the 1991 contract under the contract-revisions clause. Rather, the critical issue in Shelton was whether the policyholder's continued payment of premiums ratified the amendment adding the arbitration agreement to her policy. In the present case, the critical question is whether Blue Cross complied with the procedures specified in its contract for amending that contract. We consider that question in light of the settled principles of contract law that govern the formation of contracts in this state, including the principle *528 that a contract will be construed strictly against its drafter. Premiere Chevrolet and Ex parte Roberson, supra. See also Western Sling & Cable Co. v. Hamilton, 545 So.2d 29 (Ala.1989).
Applying those principles, we hold that the evidence before the trial judge was insufficient to establish that Blue Cross effectively amended the 1991 contract to add the arbitration provision. The record is devoid of any proof that Blue Cross had changed the contract by a written amendment, endorsement, or revision "signed by one of [its] officers and sent by [it] to [the policyholder]." Accordingly, because Blue Cross failed to prove that Brooks's C Plus policy was amended to include the arbitration provision, we must affirm the trial court's judgment denying arbitration.
Our holding relates only to Brooks's claim, as asserted on her behalf by Woodruff. The trial court has not ordered class certification, and no evidentiary submissions or arguments of law or fact were presented either below or to this Court on the question whether the policy had been validly amended as to any other policyholder. Accordingly, nothing prevents Blue Cross from attempting to establish, during further proceedings before the trial court involving policyholders other than Brooks, that it complied with that policy-revision requirement, including the possible satisfaction of that requirement by proof of written amendments, endorsements, or revisions signed by one of its officers and filed with the Department of Insurance. American Termite & Pest Control, Inc. v. Riley, 775 So.2d 179 (Ala. 2000) (in the absence of class certification, the trial court's ruling concerning a motion to compel arbitration in a putative class action applied only to the particular individuals who were before the court). Given the particular focus of our rationale and our holding, we need not address at this time the question whether the act of filing signed documents with the Department of Insurance satisfies the requirement in the 1991 contract that any written amendment be "signed by one of our officers and sent by us to you or your group."
AFFIRMED.
MOORE, C.J., and HOUSTON, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
SEE, J., dissents.
JOHNSTONE, J., recuses himself.
SEE, Justice (dissenting).
I respectfully dissent.
During oral argument before this Court, Woodruff asserted, for the first time, that Blue Cross did not comply with procedures it had established for effecting a change in its contract with Brooks and, therefore, that Blue Cross did not satisfy its burden of proving the existence of a valid agreement to arbitrate. The majority opinion states, "It is unfortunate that the plaintiffs did not raise [this argument] in the trial court, or even later in briefs submitted to this Court.... Nonetheless, the issue was explicitly argued at oral argument, and we are now obliged to address it." 803 So.2d at 525. I disagree.
Rule 28(b), Ala. R.App. P., requires, by reference to Rule 28(a)(5), that the appellee's brief contain the appellee's "contentions... with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on" (emphasis added); see Hutchins v. Shepard, 370 So.2d 275, 276 (Ala.1979) (refusing to consider on appeal an issue raised for the first time during oral argument in this Court). This Court should decline to address an issue raised for the first *529 time at oral argument unless, at a minimum, the parties are given an opportunity to brief that issue. Softball Country Club-Atlanta v. Decatur Fed. Sav. & Loan Ass'n, 121 F.3d 649, 654 n. 9 (11th Cir.1997) ("Because [the] Plaintiffs have not had an adequate opportunity to address this matter [raised by the defendant for the first time at oral argument]... we decline to entertain it."); see also Roberts v. Commissioner of Internal Revenue, 175 F.3d 889, 898 n. 11 (11th Cir.1999) ("we normally do not address issues raised for the first time at oral argument"). This Court should not base its decision on a party's belatedly raised argument where, as in this case, the opposing party did not have an adequate opportunity to respond to that argument. See Bigby v. United States Immigration & Naturalization Serv., 21 F.3d 1059, 1063 n. 6 (11th Cir.1994) (stating in response to appellee's argument made for the first time at oral argument, "In light of the absence of briefing, we decline to address this issue.").
NOTES
[1] Woodruff proceeds under the authority of a power of attorney granted to her by Brooks.