UNITED STATES DISTRICT COURT 
 FOR THE MIDDLE DISTRICT OF ALABAMA 
 EASTERN DIVISION 

CHARLES BAKER, et al., ) 
 ) 
Plaintiffs, ) 
 ) 
v. ) CASE NO. 3:19-cv-00572-RAH 
 ) WO 
RABREN GENERAL ) 
CONTACTORS, ) 
INC., et al., ) 
 ) 
Defendants. ) 

 MEMORANDUM OPINION AND ORDER 

I. Introduction 

This is a construction contract and performance dispute made complex by the 
lack of contractual formality by two sophisticated parties at the outset of their 
latest—but not their first—relationship. 
Presently before the Court is the Motion to Compel Arbitration, or In the 
Alternative, Motion to Dismiss Plaintiffs’ Claim (Motion) (Doc. 12), filed by 
Defendant Rabren General Contractors, Inc.1 (Rabren) and the Objection and Motion 
to Strike Defendants’ Evidence (Objection) (Doc. 20), filed by Baker Construction 
Services, LLC (Baker). The Motion seeks enforcement of an arbitration clause 

1 Rabren General Contractors, L.P. and Rabren General Contractors, L.P. of Auburn formerly 
were plaintiffs in this action but were voluntarily dismissed. 
contained in an unexecuted written subcontract drafted by Rabren in the course of 
the parties’ negotiations over one specific project (Subcontract). Despite the 

subcontract’s clear language stating that it is not valid unless initialed, Rabren 
demands arbitration of Baker’s claims on the basis of the latter’s manifestation of its 
assent to the Subcontract through its subsequent actions. Rabren also contends, in 

the alternative, that the Complaint should be dismissed for failure to state a claim. 
Having reviewed the parties’ briefs and evidentiary submissions on this matter 
and having conducted oral argument, the Court denies the Motion in full. Because 
the affidavit made the basis of Baker’s Objection has not affected this decision, the 

Court further denies the Motion to Strike as moot. 
II. General Facts and Background 

Baker is a concrete contractor that has worked with Rabren, a general 
contractor and Alabama corporation, on several projects dating back to 2000. (Doc. 
18-1.) In 2015, at least according to Baker, Baker and Rabren reached an 
understanding and agreement in which Rabren would hire Baker to perform all of 
Rabren’s concrete work in Alabama in exchange for Baker’s agreement not to bid 

against Rabren on any projects. (Doc. 1 at 2, 6.) Over the years, the parties’ dealings 
on specific projects largely had taken the form of handshake arrangements. (Doc. 
18-1.) For the most part, purchase orders and email communications usually 

evidenced their relationship and accord. (Id.) 
On September 16, 2015, Rabren entered into a Prime Contract with Auburn 
City Schools for the construction of a new high school in Auburn, Alabama (the 

Auburn project). (Doc. 13-1 at 3.) Consistent with the parties’ past practice, emails 
and discussions between Rabren and Baker followed. (Id.) Ultimately, sometime 
in September 2015, Rabren hired Baker to perform all concrete work on this site for 

$952,157.00. (Id.) 
Thereafter, Rabren sent Baker a 44-page Subcontract for Baker to execute in 
connection with the Auburn project. (Id. at 3-4.) Two men from Rabren—Jon 
Rabren, its Vice President, and Bruce Ward (Ward), its Senior Project Manager—

reviewed and approved the operative text. (Id. at 3.) 
The Subcontract identified Rabren as the General Contractor and Baker as the 
Subcontractor. (Doc. 13-3 at 17.) Crucially here, it contained an arbitration 

agreement requiring arbitration of “all claims of the Subcontractor” under the 
construction industry rules of the American Arbitration Association. (Id. at 15.) The 
Subcontract included signature lines for both Rabren and Baker. (Id. at 17.) In bold 
type at the top of each page, the following statement appeared: 

FOR THE SUBCONTRACT TO BE VALID, YOU MUST INITIAL 
EVERY PAGE; INITIALS ______________ 

(Id. at 4-46.) 
On October 7, 2015, Ward mailed two copies to Baker’s last known physical 
mailing address. (Doc. 13-2 at 2.) The cover letter’s second sentence reads: “Please 
initial the front of all pages, sign, and return both copies to 306 Persimmon Drive, 
Auburn, AL 36830.” (Id. (emphasis in original).) On November 24, 2015, another 

copy was sent to Charles Baker, not Baker Construction, via an email address 
previously used by one of his predecessor companies. (See Doc. 13-1 at 3; see also 
Doc. 13-3 at 2.) Ward sent a follow-up email on December 14, 2015. (Doc. 13-1 at 

3-4; see also Doc. 13-4.) That missive specifically asked Charles Baker whether he 
would “be in town this week or next,” as Ward would “like to sit down with . . . 
[him] and review scope and finalize [S]ubcontract.” (Doc. 13-4 at 2.) 
Yet, even while discussion over the terms apparently followed, the 

Subcontract was not initialed or signed by either party. 
Instead, although neither party had done so, Rabren allowed Baker to proceed 
and perform the general work outlined in the Subcontract. (Doc. 19-3.) In addition 

to these broad responsibilities, Baker undertook certain other tasks contemplated 
under the Subcontract, such as the procurement of liability insurance and submission 
of pay applications. (Doc. 18-1 at 10, 14-15.) Furthermore, although the Subcontract 
required that any changes and modifications to the terms and conditions be reduced 

to writing and signed by the parties in order to be valid, no such change orders were 
ever executed despite the fact that changes were made during Baker’s performance 
on the Auburn project. (Docs. 13-3 at 17; 13-8 at 1-5; 18-1 at 13.) 

In August 2016, Baker left the Auburn project. (Doc. 13 at 9.) According to 
Charles Baker, he did so because of nonpayment by Rabren, alleged racial and ethnic 
hostilities by Rabren employees toward himself and other Baker employees, and 

Rabren’s purported failure to prepare the site for Baker’s work. (Id.) Rabren, 
however, claims that Charles Baker and his company simply abandoned their 
responsibilities as a result of performance issues and nonpayment. (Doc. 13-1 at 5.) 

At the time of this departure, Rabren had paid $508,670.44 despite being fully aware 
that neither party had signed or initialed the Subcontract. (Id.) 
After leaving the Auburn project, Baker submitted a claim to Rabren’s surety. 
(Docs. 13-12; 13-13; 18-1 at 16.) As part of its investigation process, the surety 

requested a copy of Baker’s supporting documents. (Doc. 18-1 at 16.) Among the 
documents submitted by Baker in response was the unexecuted Subcontract. (Id.) 
III. Relevant Legal Principles 

Passed in 1925, and presently codified in title 9 of the United States Code, the 
Federal Arbitration Act was designed to facilitate the enforcement of arbitration 
agreements. 9 U.S.C. § 2; S. Rep. No. 68-536, at 3 (1924); H.R. Rep. No. 68-96, at 
1–2 (1924); Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 126 F.2d 978, 

983 (2d Cir. 1942). Over time, the FAA has come to be seen as embodying “a liberal 
federal policy favoring arbitration,” and its second section (Section 2) always has 
been regarded as its “primary substantive provision.” Moses H. Cone Mem’l Hosp. 

v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). Per this section’s first sentence, 
widely known as the FAA’s “Command Clause,” the FAA preempts any contrary 
state law in cases involving interstate contracts or maritime transactions. Dean 

Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 221 (1985). “Under the FAA, parties 
cannot be forced to submit to arbitration if they have not agreed to do so.” Chambers 
v. Groome Transp. of Ala., 41 F. Supp. 3d 1327, 1339 (M.D. Ala. 2014) (quoting 

Chastain v. Robinson-Humphrey Co., 957 F.2d 851, 854 (11th Cir. 1992)). A court 
must itself determine whether an agreement to arbitrate unless the parties have 
expressly agreed to leave such decision to an arbitrator. See id. at 1335-36 
(discussing First Options of Chicago., Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995)). 

As the Eleventh Circuit has said, “a party seeking to avoid arbitration must 
[first] unequivocally deny that an agreement to arbitrate was reached and must offer 
some evidence to substantiate the denial.” Magnolia Capital Advisors, Inc. v. Bear 
Stearns & Co., 272 F. App’x 782, 785 (11th Cir. 2008) (internal citations omitted).2 

To do so, the resistant party must “‘substantiate[] the denial of the contract with 
enough evidence to make the denial colorable.’” Id. Once—and only once—an 
agreement to arbitrate has been put “in issue,” the FAA requires the district court to 

“proceed summarily to the trial thereof” and, if the objecting party has not requested 
a jury trial, “hear and determine such issue.” Id. (internal citations omitted). 

2 Although unpublished opinions, generally denominated by a cite to the Federal Appendix or 
some electronic medium, “are not considered binding precedent . . . , they may be cited as 
persuasive authority.” 11th Cir. R. 36-2. The Court treats them as such here and elsewhere. 
The test to determine arbitrability and the allocation of the parties’ burdens is 
clear: 

Section 2 requires a two-pronged inquiry: first, whether there is an 
arbitration agreement in writing; and second, if so, whether the 
agreement is part of a transaction involving interstate commerce. [The 
party seeking to compel arbitration] bears the burden of proving both 
prongs. These prongs also are not resolved with the “thumb on the scale 
in favor of arbitration because the federal policy favoring arbitration 
does not apply to the determination of whether there is a valid 
agreement to arbitrate between the parties. 

Chambers, 41 F. Supp. 3d at 1338 (internal citations omitted). 
Usually, courts must look to state law principles of contract formation to 
determine whether an agreement to arbitrate exists. See First Options, 514 U.S. at 
944; Chambers, 41 F. Supp. 3d at 1342. 
In addition, the Eleventh Circuit has countenanced the use of the summary 
judgment-like standard to resolve a motion to compel arbitration. See In re Checking 
Account Overdraft Litig., 754 F.3d 1290, 1294 (11th Cir. 2014) (describing an order 
compelling arbitration as “summary-judgment-like” and “in effect a summary 
disposition of the issue of whether or not there has been a meeting of the minds on 
the agreement to arbitrate”). 
IV. Discussion 

A. Rabren’s Arbitration Motion 
The primary issue before the Court is Rabren’s insistence that Baker must 
resort to arbitration pursuant to the relevant provision of the unsigned and uninitialed 
Subcontract. 
The parties, naturally, provide sharply divergent arguments as to this issue. 

According to Rabren, the parties discussed the Subcontract in general and its terms 
and conditions in particular, and Baker manifested its intent to be bound by the 
Subcontract during these consultations and by its subsequent actions. (Doc. 13-1.) 

Baker disputes Rabren’s assertions, submitting affidavit testimony from Charles 
Baker unequivocally stating that he “never saw, signed or agreed to the alleged 
contract” (Doc. 18-1 at 17), “never discussed the alleged subcontract with any of the 
Defendants,” (Doc. 18-1 at 2), and “did not agree to or act under the alleged 

subcontract” (Doc. 18-1 at 16). 
But for the undisputed fact that the Subcontract was never signed and initialed 
by the parties to this case, including Rabren, the Motion would be a quick one for 

the Court to resolve favorably to Rabren. 
However, as in life, rarely do things come easy. In as much as Rabren argues 
that Baker’s actions subsequent to Rabren’s submission of the Subcontract constitute 
evidence of Baker’s manifestation of the Subcontract’s acceptance, Rabren’s 

decision to allow Baker to begin and continue its work on the Auburn project in the 
absence of an executed Subcontract equally supports the conclusion that Rabren did 
not intend the parties to be bound by it. As such, that Baker performed concrete 

work at the Auburn project after the Subcontract was sent to Baker constitutes little 
evidence that either party intended to be bound by it. The evidence, in other words, 
cuts for and against both parties, far less than necessary to support any definitive 

determination as to the parties’ original intent and thus an order compelling 
arbitration. 
Regardless, Baker and Rabren present the Court with something else entirely: 

a completely unsigned Subcontract, one not even signed by the very party now 
demanding its enforcement during the entire time of the parties’ association; general 
noncompliance by both parties with its terms and conditions; and contrasting 
testimony regarding each party’s knowledge of and intent to be bound by the 

Subcontract. Perhaps recognizing the difficultly presented by its failure to present a 
written signed Subcontract, Rabren resorts to inundating the Court with over 100 
pages of affidavit testimony, emails, unsigned change orders, unsigned payment 

applications, and project drawings and specifications in an attempt to show that 
although Baker never signed the Subcontract, nevertheless Baker is bound by it 
through its actions. (Docs. 13; 14.) Baker is no less guilty, for it too has flooded the 
Court with over 100 pages of affidavit testimony and emails in an attempt to prove 

the opposite. (Docs. 17; 18-1; 18-2; and 19.) While the parties’ document dump 
may occasionally lead to the inescapable conclusion that there is a genuine issue of 
material fact on the issue of mutual assent, this is not so here. 
Well-established law explains why this is so. Both the Supreme Court and 
the Eleventh Circuit have held that because arbitration is a matter of contract, 

determining the validity of an arbitration agreement “is generally a matter of state 
law.” Entrekin v. Internal Med. Assocs. of Dothan, P.A., 689 F.3d 1248, 1251 (11th 
Cir. 2012) (quoting Stolt-Nielsen S.A. v. Animal Feeds Int’l Corp., 559 U.S. 662, 

681 (2010)); see also Caley v. Gulfstream Aero. Corp., 428 F.3d 1359, 1368 (11th 
Cir. 2005) (“[I]n determining whether a binding agreement arose between the 
parties, courts apply the contract law of the particular state that governs the 
formation of contracts.”). This law compels all courts to “apply ordinary state-law 

principles that govern the formation of contracts.” First Options, 514 U.S. at 944. 
And, of course, “[t]he highest court of each State . . . remains the final arbiter of 
what is state law.” Montana v. Wyoming, 563 U.S. 368, 377 n.5 (2011). 

Under Alabama law, “[t]he requisite elements of [a contract] include: an offer 
and an acceptance, consideration, and mutual assent to terms essential to the 
formation of a contract.” Lyles v. Pioneer Housing Sys., Inc., 858 So. 2d 226, 229 
(Ala. 2003) (quoting Ex parte Cain, 838 So. 2d 1010, 1027-28 (Ala. 2002)). Not 

only must assent “be manifested by something,” S. Energy Homes, Inc. v. Hennis, 
776 So. 2d 105, 108 (Ala. 2000), but “one who asserts that she is not a party to a 
contract in order to avoid arbitration ‘disclaims any basis for recovery on her claims’ 

under the contract,” Lyles, 858 So. 2d at 229 (citing Ex parte Warren, 718 So. 2d 45, 
47-48 (Ala. 1998) (plurality opinion)). Accordingly, the issue before the Court is 
whether, under the particular facts in this case, the signatures and initials of both 

parties are required in order to demonstrate, under a summary judgment-like 
standard, the existence of mutual assent to the formation of the arbitration agreement 
in the Subcontract. 

Alabama law provides “[t]he purpose of a signature on a contract is to show 
mutual assent.” Ex parte Rush, 730 So. 2d 1175, 1177-78 (Ala. 1999) (citing Ex 
parte Holland Mfg, 689 So. 2d 65 (Ala. 1996)). But the Eleventh Circuit has noted 
that, “while the FAA requires that the arbitration agreement be in writing, it does not 

require that it be signed by the parties.” Caley, 428 F.3d at 1368. Alabama’s state 
appellate courts have said the same. See, e.g., Bowen v. Sec. Pest Control, Inc., 879 
So. 2d 1139 (Ala. 2003); Rush, 730 So. 2d at 1175. 

It is that general proposition that Rabren advances in arguing that no 
signatures are needed on the Subcontract when the parties’ own actions manifest 
their intent to be bound by the terms and conditions of the contract. (Doc. 13 at 13-
19.) And Rabren is correct that there are a multitude of case decisions where 

Alabama courts, state and federal, have compelled arbitration under a contract or 
document that is void of signatures. 
However, Rabren ignores the recognized exceptions to the rule regarding the 
ability to enforce an arbitration provision in the absence of a signed contract or 

document. As the Supreme Court of Alabama has held, 

Unless a contract is required by a statute to be signed (the FAA contains 
no such requirement), or by the Statute of Frauds to be in writing (the 
contract here is not subject to Alabama's Statute of Frauds, Ala. Code 
1975, § 8-9-2, which requires the signature of the party against whom 
enforcement is sought), or unless the parties agree that a contract is 
not binding until it is signed by both of them ..., it need not be signed by 
the party against whom enforcement is sought, provided it is accepted 
and acted upon. 

Rush, 730 So. 2d at 1178 (emphasis added). It is the third referenced exception that 
this Court ordered the parties to address in supplemental briefing after conducting 
oral argument on the Motion and Motion to Strike. (Doc. 34.) 
In the present case, the Subcontract that Rabren seeks to invoke is, if nothing 
else, unambiguous in one crucial respect: in clear and unmistakable terms it provides 
that it is not valid unless each page is initialed by the parties. (See Doc. 13-3 at 3-
46.). Even the first email from Rabren confirms a necessary signature requirement, 
as it says so in its very second clause—and in bold underline. (See Doc. 13-2 at 2.) 
As written and conveyed, the Subcontract itself thus explicitly limits how the parties 
can manifest their intent and, here, that can only be through initialing the 
Subcontract. (See Doc. 13-3 at 3-46.) From the very beginning, the Subcontract 
thus predicated its enforceability on the parties’ compliance with several explicit 
requirements. Whatever the parties did thereafter cannot change this essential fact: 
its existence—which included that fateful arbitration clause—depended upon 

compliance with its conditions, regardless of the parties’ thought then and 
afterward.3 
While parties can manifest their intent to be bound by a contract through their 

subsequent actions, thereby ratifying it, e.g., Hennis, 776 So. 2d at 108, similar 
express limitations on how the parties can manifest assent have prompted a number 
of federal and state courts to refuse to enforce arbitration agreements in contracts 
that require the parties to sign them. See, e.g., Stover v. Valley Rubber LLC, No. 

5:18-cv-1795-LCB, 2019 WL 4538682, at *3 (N.D. Ala. Sept. 19, 2019); Med Ctr. 
Cars, Inc. v. Smith, 727 So. 2d 9, 14-15 (Ala. 1998) (concluding that arbitration 
agreement contained in a buyer’s order that contained language stating that it was 

not valid unless accepted by the seller was not enforceable because the defendant 
seller failed to sign the buyer’s order); Blue Cross & Blue Shield of Ala. v. Woodruff, 
803 So. 2d 519, 526 (Ala. 2001) (refusing to enforce arbitration agreement contained 
in insurance policy amendment that was not properly amended under policy 

language due to absence of a signature); Premiere Chevrolet, Inc. v. Headrick, 748 
So. 2d 891, 892-93 (Ala. 1999) (relying on and reaching the same conclusion as 

3 In such cases, relief can be sought, but not based on the contract. Instead, either party would be 
forced to resort to quasi-contract or tort theories. 
Medical Centers Cars, Inc. v. Smith, 727 So. 2d at 14). Ratification of a contract 
can, in fact, take place via action even as to an unsigned document, but only when 

the contract plainly classifies such conduct as having that effect. Cf. Baptist Health 
Sys. v. Mack, 860 So. 2d 1265, 1273-74 (Ala. 2003) (explaining what kind of post-
receipt conduct can amount to true ratification and ultimately enforcing an 

arbitration agreement between an employee and employer where the terms of the 
arbitration agreement specifically indicated that an employee’s continued 
employment would indicate acceptance of the agreement); Young v. Turner 
Specialty Servs., LLC, No. 7:18-cv -02083-LSC, 2019 WL 2869676, 2019 U.S. Dist. 

LEXIS 111298 (N.D. Ala. July 3, 2019) (canvassing relevant case law). Otherwise, 
only a signature will work to render enforceable a contract onto which such a 
prerequisite has been crafted. See Power Equip. Co. v. First Ala. Bank, 585 So. 2d 

1291, 1296 (Ala. 1991) (“When a competent adult, having the ability to read and 
understand an instrument, signs a contract, he will be held to be on notice of all the 
provisions contained in that contract and will be bound thereby.”). 
For example, in Stover, the United States District Court for the Northern 

District of Alabama, in applying Alabama law, refused to enforce an arbitration 
agreement that was contained in an employee handbook. It did so because the 
written handbook acknowledgement expressly required that it be signed by the 

general manager to constitute a binding contract. 2019 WL 4538682, at *3. 
Discussing the exceptions outlined in Ex parte Rush, the Stover court noted “there 
is evidence that the parties agreed that the contract to arbitrate was not binding unless 

it was signed by both parties.” Id. In such a situation, only nonenforcement could 
follow because, after all, it could find no express, unequivocal agreement to that 
effect. 

Indeed, the principle regarding application of the contract language equally 
has been applied when nonparties attempt to compel arbitration based on a written 
arbitration provision whose express language limits its application to the signatory 
parties, even when the nonsignatory may have otherwise attempted to manifest its 

assent through its actions, such as acting in conformity with the agreement. See, 
e.g., Nissan N. Am., Inc. v. Scott, 246 So. 3d 90, 93-94 (Ala. 2017) (refusing to 
compel arbitration against a nonsignatory based on the express language of the 

arbitration agreement that limited its application to only the signing parties); Ex 
parte Stamey, 776 So. 2d 85, 89 (Ala. 2000) (stating that where “the language of the 
arbitration provisions limited arbitration to the signing parties”, the court has not 
allowed the claims against the nonsignatories to be arbitrated). 

That the parties each may have acted in conformity with some of the 
provisions of the Subcontract is largely without consequence, especially under the 
facts here, where it appears that both parties (including Rabren) failed to strictly 

comply with all of the terms of the Subcontract. In other words, partial compliance 
does not rise to the level of proving manifestation of assent from a “summary-
judgment-like” standpoint, especially in the presence of contested evidence that 

Baker actually was aware of the Subcontract when it performed the concrete work 
at the Auburn project.4 
Rabren’s additional points are just as unavailing. It first points to Baker’s 

affirmative action in submitting a copy of the unexecuted Subcontract to Rabren’s 
bonding company as part of Baker’s bond claim (Doc. 13) as evidence that Baker 
agreed to and acknowledged the terms of the Subcontract. But the legal ramification 
is a nonissue because, again, the Subcontract requires it to be signed and initialed to 

be valid. 
Rabren next presents evidence of discussions that it purportedly had with 
Baker about the Subcontract and other communications (primarily emails) and 

documents, such as unsigned change orders and unsigned and unnotarized pay 
applications5 that reference a subcontract number and project price that are 

4 A review of the Complaint reveals that Baker does not sue Rabren on the Subcontract, nor does 
it appear that Baker must sue Rabren on the Subcontract in order to successfully pursue a 
nonpayment claim. See, e.g., Dannelly Enters. v. Palm Beach Grading, Inc., 200 So. 2d 1157 (Ala. 
2016). At oral argument, Baker stipulated that it is not suing Rabren for breach of the Subcontract 
and is not basing, and will not base in the future, its claims on the Subcontract. Having stipulated 
that it is not and will not sue on the Subcontract or base its claim on the Subcontract and with the 
Court having relied upon that representation as part of the basis for denying Rabren’s arbitration 
motion, Baker cannot later shift gears and invoke the Subcontract in this litigation in support of 
any claim for relief or damages. “Having saddled up to that horse, [Baker] must continue riding 
it.” Randolph v. Green Tree Fin. Corp.-Ala., 244 F.3d 814, 816 (11th Cir. 2001). 

5 Baker has submitted pay applications of its own that do not reference a subcontract number, but 
instead reference a “PO.” 
consistent with those referenced in the Subcontract. But again, these documents do 
not alter the language of the Subcontract that requires it to be initiated on every page 

to be valid. Moreover, none of the documents submitted by Rabren reflect an 
unequivocal acknowledgment that Baker was agreeing to be bound by the 
Subcontract’s every term and condition, nor do they contain language that expressly 

incorporated the Subcontract and all of its terms by reference. See, e.g., Dannelly 
Enters. v. Palm Beach Grading, Inc., 200 So. 2d 1157 (Ala. 2016) (concluding that 
contractor could not compel arbitration of claims against subcontractor where record 
evidence only showed that the parties were operating under a work order submitted 

by the subcontractor). Indeed, not only did Rabren not require Baker to sign the 
Subcontract prior to performance, but it also has presented written change orders and 
pay applications6 that were not signed by Baker either. (Docs. 13-8 at 2-5; 13-9 at 

2-5.) Under the Subcontract, even these written change orders had to be signed in 
order to be valid. Yet, again, Rabren required no such signatures, in effect ignoring 
its own contract’s specifications. 

6 The pay applications do not contain language stating that the signatory subcontractor was 
agreeing to the terms and conditions of the Subcontract, and they do not expressly incorporate the 
Subcontract by reference. The pay applications do refer to the “Contract Documents” but they do 
not define or explain what those contract documents consist of. Thus, even if the pay applications 
had been signed and notarized by Baker, it is doubtful they would constitute sufficient summary-
judgment-like evidence of Baker’s assent to the Subcontract to warrant enforcement of the 
arbitration agreement. 
In short, the Subcontract clearly contemplates that both parties had to sign and 
initial the Subcontract in order for it to be valid and binding. Here, not only was the 

Subcontract not signed by Baker (against whom Rabren is trying to enforce it), but 
it is also not signed by Rabren. When considered in the light most favorable to the 
nonmoving party, given Baker’s unequivocal denial of an agreement to arbitrate 

under the summary-judgment-like standard that this Court must follow, Rabren has 
not met its burden under the FAA. Therefore, Rabren’s arbitration motion must be 
denied. 
B. The Motion to Dismiss 

In the alternative, Rabren argues that Baker’s claims should be dismissed for 
failure to state a claim. The Court will address each of Baker’s claims in turn. 
 1. The Breach of Contract Claim 

Count I is a claim for Breach of Contract founded upon two alleged contracts 
between Baker and Rabren. 
The first is a purported “exclusive provider contract” between the parties for 
Baker to perform all of the concrete work for Rabren’s projects in Alabama in 

exchange for Baker’s agreement not to bid against Rabren for projects involving 
concrete work in Alabama. (Doc. 1 at 2, 6.) Baker maintains that Rabren breached 
this agreement when Rabren hired other companies to perform concrete work for 

Rabren. (Id. at 6.) 
The other claim is more specific, as it actually concerns the Auburn project. 
In particular, Baker claims that it had an agreement with Rabren to pour concrete for 

the stairwells and archways at Auburn High School but that Rabren breached this 
pact by not adequately and properly preparing the site for Baker’s work and not fully 
paying Baker for the work that it actually performed. (Doc. 1 at 3.) 

In the Motion, Rabren moves to dismiss the “exclusive provider contract” 
claim, arguing that it is barred by the Statute of Frauds. (Doc. 13 at 24.) Rabren 
does not move to dismiss the contract claim specific to the Auburn project on this 
basis.7 Accordingly, the Court will only address the “exclusive provider contract”, 

which Rabren characterizes as the “universal contract” claim. 
In its simplest, Rabren argues that the exclusive provider contract claim 
“consists of an oral agreement contemplating performance for a period longer than 

one year” and therefore it violates Alabama Code (1975) § 8-9-2. (Doc. 13 at 24.) 
Conversely, Baker contends the Statute of Frauds does not apply because the 
referenced projects could be completed within one year and the statute only applies 
to executory contracts. (See Doc. 18 at 24-26.) 

7 Rabren also raises a Twombly/Iqbal argument in response to the breach of contract claim. This 
Court, however, believes Baker has sufficiently pleaded this claim in its Complaint at this point. 
However, this does not mean that this claim will survive a summary judgment motion directed to 
the underlying facts surrounding this claim. 
As it concerns the Statute of Frauds, it very well may be that it bars the 
contract claim, but it is too early in this case for the Court to make a dispositive 

ruling regarding the statute’s application. The Statute of Frauds is an affirmative 
defense that can only be considered at this stage if it is apparent on the face of the 
Complaint that it applies. See Hudson Drydocks, Inc. v. Wyatt Yachts, Inc., 760 F.2d 

1144, 1146 n.3 (11th Cir. 1985). At this point, the Court cannot conclude that 
dismissal of this claim based on the Statute of Frauds inexorably follows based on 
the face of the Complaint. Accordingly, the Court will deny the Motion to the extent 
it seeks dismissal of Count I, but will be ready to address it once the parties adduce 

additional relevant facts at or before this matter’s summary judgment deadline. 
 2. Hostile Work Environment 

Count II of the Complaint alleges that Baker was subject to a racially and 
ethnically hostile work environment from Rabren in violation of 42 U.S.C. § 1981. 
In particular, its performance and payment, Baker insists, was negatively impacted 
because of the racial and ethnic animosity exhibited by Rabren employees at the 

jobsite. (Doc. 1 at 7-8.) 
Rabren targets this claim for dismissal. It first argues that this kind of claim 
requires the existence of an underlying contract, and since there is no underlying 

contract due to the Statute of Frauds, there can be no Section 1981 claim. (Doc. 13 
at 26.) In addition, Rabren argues that Baker, as an artificial entity, cannot assert a 
hostile work environment claim as a matter of law. (Id. at 27.) 
The Court finds both of these attacks to be premature at this stage. First, to 

the extent Rabren challenges this claim based upon the Statute of Frauds, the Court 
already has concluded so. As to whether a Section 1981 hostile work environment 
claim can be asserted by an artificial entity as a matter of law, the same conclusion 

follows. In the Court’s view, at this stage, the parties simply have not provided 
sufficient facts and legal argument to rule regarding the validity of such a claim, 
especially since the legitimacy of this claim could turn on factual issues such as the 
type of artificial entity at issue8, the number of and race and ethnicity of each of its 

members, owners and employees, the nature of the hostile environment in terms of 
who said what, when and to whom, and the impacts and damages specific to the 
entity. The Court thus will revisit Rabren’s argument at the summary judgment stage 

with the hope that the parties have further developed the factual and legal basis for 
this argument, particularly whether it holds any water within the Eleventh Circuit. 

V. Conclusion 
For the foregoing reasons, it is hereby ORDERED that Defendant Rabren 
General Contractors, Inc.’s Motion to Compel Arbitration, Or in the Alternative, 

8 The Court foresees a distinction that could be drawn based on the type of artificial entity involved. 
For example, a closely-held single-member limited liability company may have a more racial and 
ethnic identity compared to a multi-shareholder C-corp. that is largely disconnected from the 
identities of its thousands of shareholders and employees. 
Motion to Dismiss Plaintiffs’ Claims (Doc. 12) is due to be and is hereby DENIED. 
It is further ORDERED that Baker Constructions Services LLC’s Objection and 

Motion to Strike Defendants’ Evidence (Doc. 20) and Motion for Leave to File 
Reply (Doc. 39) are DENIED as moot. 
DONE, this 5th day of May, 2020. 

 /s/ R. Austin Huffaker, Jr. 
 R. AUSTIN HUFFAKER, JR. 
 UNITED STATES DISTRICT JUDGE